# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JENNIFER BRUNNER, | ) Case Number: 4:23-cv-2180 |
| Plaintiff | ) Judge Pearson |
| v. | ) |
| FRANK LAROSE, et al. | ) |
| Defendants. | ) |

# Exhibit 3

1  Testimony of Retired Justice and Executive Director, Ohio Judicial Conference, Paul Pfeifer,

2  before the Ohio General Assembly's House Government Oversight Committee on the

3  companion bill to Senate Bill 80, House Bill 149

4  March 25, 2021

5

6  As electronically transcribed using DropBox storage of the video

7  without editing, except for added title and page and line numbering.

8

9  - Thank you, Chair Wilken. Ranking Member White is no longer with us, or excuse

10  me,

11  Vice -Chair White is no longer with us, ranking member Sweeney is, in fact, with us.

12  I'm Paul Pfeiffer, Executive Director of the Hio Judicial Conference. the Judicial

13  Conference represents all 723 judges in this state from the Supreme Court down to

14  the part -time county court judges.

15  The Judicial Conference is opposed to House Bill 149. We appreciate Sponsors'

16  interest in... calling attention to judicial races.

17  We would note that this proposal is not one that judges are asking for, nor were the

18  judges consulted before this legislation was introduced.

19  Now you've heard a good deal this morning about impartiality impartiality which is

20  the what we need to have the hallmark of the judiciary I am I have filed written

21  testimony I'm not gonna read that you're running up against noon I but I I I have to

22  reflect on what I heard two in the Senate and what I heard earlier last week on the

1   testimony that suddenly everyone became concerned with roll-off in judicial

2   elections.

3   Well, we've had this system for 110 years, according to one of the Senate's

4   sponsors. there's always been roll-off. The roll-off down the ballot just happens.

5   And why does that happen? It happens because people look at a particular lineup

6   and say, "I don't know these people. I'm not going to vote." I don't think that's an

7   unintelligent thing to do.

8   So, I don't know. you've heard from the Bar Association discussion of, well, if the

9   goal is, if the goal truly is, we would like to have more people not drop off when

10  they get to the judicial races.

11  Then we would fully support what the State Bar has suggested, and that is public

12  funding of a nonpartisan voter information guide. [end of transcript] and it should list

13  the following-- your education,

14  your work experience. I would say it should not list your volunteer work, because if

15  you say that's going to be part of the deal,

16  then people are going to suddenly be volunteering. And how do we know? Was that

17  just on the resume? But the relevant things are your-- education,

18  your work experience, were you a prosecutor, were you a public defender, were you

19  a magistrate? If you're running for the Common Pleas bench or the municipal bench,

20  did you do trial work? If you're running for the probate, judgeship, was that the

21  nature of your practice? Do you have experience in the area that you're...

1   seeking to set on the bench for? Those would all be good, and that would be a step

2   forward. Instead,

3   we see legislation prompted, certainly, you know, my members ask why,

4   you know, know, what's motivating this? And I think it's pretty clear that the

5   sponsors didn't suddenly wake up one morning and say, my God,

6   we've got to do something about roll-off and judicial elections. There's something

7   else going on here. And let's get right down to what that is.

8   In the last two, three, four, five, six, seven, eight, nine, 10, 11, rounds on Supreme

9   Court races, Democrats prevailed in three out of the four.

10  And the Republicans that run the state headquarters are embarrassed by that. So

11  they're looking around saying, well, what can we do to improve it?

12  And they've come up with the idea. that putting party labels would improve their

13  chances. Well, I've attached to my testimony the outcome in Supreme Court races

14  going back a long time.

15  And I think if you look at that, you would be hard put to conclude that in any race,

16  having party identification would have changed the outcome.

17  outcome in those races. With the exception of when Bill O'Neill beat Bob Cup, Bill

18  O'Neill was not the endorsed Democrat.

19  He won without the endorsement. Fanon Rucker was the endorsed Democrat. He

20  had no real Democrat party support. He raised his hand.

21  no money and he still won. Now Bill would tell you he won because of his clever

22  use of social media. I doubt that.

1   His name happens to be the same as Bill O'Neill who was Speaker of the Ohio

2   House, Attorney General, Governor and Chief Justice.

3   That's Bill O'Neill. advantage the Bill O'Neill had in that particular race. You could

4   look at a couple of other races and say well that was close.

5   Justice Fisher's race was closed, 22,000 votes. So a party label had been there.

6   Justice Fisher might not be Justice Fisher. It might be Justice Donnelly or O'Donnell.

7   instead. So that's really what this legislation is about. We think it's a poor reason to

8   change,

9   and I will address just briefly the argument that says, well, to get on the ballot,

10  unless you want to run as an independent,

11  which is is extremely difficult, to get on the ballot, you have to run a party primary,

12  and Ohio is different than any other state in that regard.

13  I view that as a plus and an obligation on the political parties. It is their obligation

14  to help select voters.

15  the best possible candidate to run for justice or chief justice of the Supreme Court,

16  to run for the Court of Appeals, to run for the local judgeships,

17  and to put that candidate up against the other party's candidate. That's a public

18  service that the political parties provide.

19  But after you get behind it, you that, again, as you heard the arguments of

20  perception, it's not just perception, it is how do people who decide to run for judge

21  think of themselves?

1   We have an elaborate system that you, the legislature, pays for because you pay all

2   of the costs of the Supreme Court and the other judicial folks.

3   And that is training. The moment someone decides they're going to run for judicial

4   office, they have to go through training even before the race takes place.

5   And that training focuses on all of the things that you cannot do, must not do, as a

6   candidate for judicial office that you could do if you had previously previously been,

7   for example, prosecutor. A lot of judges were prosecutors before they became

8   judges. A lot have held public office.

9   Legislators convert over to a run for a judicial office. I did. Uh, you change when

10  when you are.

11  running for a judicial office. You must change and your life changes and it must. And

12  it's all of the rules,

13  the Code of Judicial Conduct are focused on being impartial, understanding it's

14  vitally important that you are impartial.

15  And it's all of the rules. that your behavior both on and off the bench creates the

16  continued perception that you are an impartial person.

17  I will wrap up by simply saying in the position I now hold as Executive Director of

18  the Judicial Conference. I've been in four years years and I don't know the political

19  party affiliation of most the members of the Judicial Conference.

20  It's irrelevant. I just saw one of the public defenders who practices in Kayoga County

21  and I had to ask him,

1   is the Court of Appeals in Kayoga County, are there any Republicans on the the

2   Court of Appeals in Cuyahoga County now? And he said no,

3   not at this point because Judge Heaton was defeated and he was a Republican

4   appointed,

5   I believe, by Governor DeWine. So none at this point. But I didn't know that because

6   it doesn't doesn't matter. I will tell you that the Court of Appeals Association,

7   their executive committee took a vote and they were unanimous in opposition to

8   that. Does that mean that every Court of Appeals judge would be opposed to this?

9   We did our poll of our executive committee and allowed it to be anonymous.

10  anonymous because we figured well some would look at and say this works for me

11  because I'm a Democrat and a safe Democrat Jurisdiction or county or I'm a

12  Republican and safe and overwhelmingly they still said this is just a bad idea I think

13  the vote was 26 to oppose four favor 3,

14  say, stay out of it, and that is, that's a cross section of judges across the state. I

15  would point out to you,

16  and I brought along the map, that you not only are addressing this from the

17  standpoint of the Supreme Court,

18  but the courts of appeals. The practical impact of this legislation will undoubtedly be

19  that in the third,

20  the fourth, and the twelfth appellate district, if you put party label next to the

21  candidates, if it will be exceedingly difficult for a Democrat to compete in those

22  appellate districts.

6

1   If you put party label on the ballot in the first, the 10th, and the eighth, the eighth is

2   Cuyahoga County,

3   the 10th is Columbus or Franklin County, which is is trending very rapidly to Become

4   very difficult for A republic and to succeed I know one of the very Very well regarded

5   judges had lost in the last election here in Franklin County Call me one day and said

6   Paul.

7   I'm withdrawing my name For consideration for a gubernatorial appointment to the

8   10th appellate district. I'm convinced. I can't win Because I'm a Republican so I

9   would hold this seat for very brief period of times and I would lose the first Hamilton

10  County Big changes there It gives me to be that was a safe Republican County.

11  It's the other way now. So in those for sure you're eliminating any reasonable chance

12  of competition and I think that's unhealthy.

13  It means once you win a primary in those six appellate districts you don't need to

14  leave your front porch because you just virtually can't lose.

15  That's not healthy all the way around. Now, I've heard it said that, oh, if you're a

16  Republican,

17  you're a conservative, if you're a Democrat, you're a liberal. I will tell you that

18  perception is really based on national,

19  what we've watched on television, watching the unfortunate circus that has become

20  the confirmation of the United States Supreme Court justices.

21  Highly divisive, it's destructive, but one should think about what do state courts,

1   justices and judges do? Principally, it's criminal cases. Principally criminal cases, and

2   I can tell you you can't tell the party label of a judge involved in a criminal case

3   when you saw it at the Supreme Court level,

4   you can't at all. Now, Now, Mr. Wagner was in here and saying, well, perceptions of

5   judges, I know in a place like County where you have 34 common police judges,

6   the conversation that a lawyer might have with a client is not, is the judge a

7   Republican or a Democrat?

8   It is. It is how much of a hanging judge? How difficult is this judge on criminal

9   defendants and there's a range But the notion that Criminal justice is applied

10  differently between Democrat and Republican judges just doesn't cut it at all.

11  So I want to wrap up by just posing this to you. As I said,

12  I think this bill is motivated by a belief at Republican headquarters that this will

13  somehow help in the next Supreme Court.

14  Court races. Having an R or D doesn't define a candidate for Supreme Court. And I'll

15  just point to yesterday's debate here in the House about constitutionality of the veto

16  override of the legislation rule.

17  regarding the governor's powers with respect to health care. Now, I defy anyone

18  looking at the Supreme Court races and say,

19  OK, we've got an R &D. How do you think this would come out in a throwdown

20  between the governor and the judge? General Assembly. R or D doesn't tell you

21  anything about how that would come out.

22  Just nothing. The most controversial decision in the Supreme Court was,

1   while I was there, was to Rolf. and the Supreme Court, I was part of the majority,

2   declared the funding of public schools unconstitutional, four to three, two Democrats

3   and two Republicans.

4   Now when those candidates for the Supreme Court ran for office, would you've been

5   able to tell how that would come out?

6   No. There's one, one decision every 10 years in the Supreme Court that has political

7   ramifications and that is apportionment.

8   You're looking at that coming at the Supreme Court? Court as it's now constituted.

9   It's four to three Republican. Do I know how that will come out? No. The last time it

10  was there,

11  the Republican-drawn ballot, the Republican-drawn map, was affirmed four to three.

12  The court was six-one Republican.

13  Republican. I dissented, Chief Justice O'Connor dissented, and I dissented for a very

14  simple reason. That,

15  in that case, affirmed the maps. I dissented for the simple reason that it appeared

16  the map drawers had ignored the mandate of the Constitution,

17  that districts be compact. And if you think they're compact, look at the map, look at

18  the map of the district,

19  one of the sponsors of this bill, isn't it? I want to, and I want to re-enterate.

20  We think there are ways to improve. the amount of knowledge that voters have of

21  judicial candidates and the State Bar Association has laid that out.

1   We'd be fully supportive of that. To go, what this bill proposes, puts us in the narrow

2   company of five states,

3   I believe, Texas, Louisiana, Alabama. now North Carolina went from nonpartisan to

4   partisan Pennsylvania and Illinois.

5   Every one of those states is pretty much different from us in the way --

6   Pennsylvania, Supreme Court, ten -year terms, and it's partisan and then it's retention

7   election.

8   In Illinois, they run -- from districts. In Texas, it's nine Supreme Court justices and

9   then nine Supreme Court criminal appeals judges.

10   So 18 Supreme Court races, very different from Ohio.